**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LR TRUST, derivatively on behalf of OKTA, INC., <br><br> Plaintiff, <br><br> vs. <br><br> TODD MCKINNON, J. FREDERIC KERREST, SHELLYE ARCHAMBEAU, ROBERT L. DIXON, JR., JEFF EPSTEIN, PATRICK GRADY, BENJAMIN HOROWITZ, REBECCA SAEGER, and MICHAEL STANKEY, <br><br> Defendants, <br><br> -and- <br><br> OKTA, INC., <br><br> Nominal Defendant. | No. <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff LR Trust, by its undersigned attorneys, brings this stockholder derivative action on behalf of nominal defendant Okta, Inc. ("Okta" or the "Company") against the members of the Company's Board of Directors for their breaches of fiduciary duties, violations of the federal securities laws, and other misconduct that resulted in material damage to the Company and its stockholders. These allegations are made upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief based upon the investigation and analysis by Plaintiff's counsel, including, among other things, a review of the Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, transcripts of Okta conference calls with financial analysts and investors, news reports, financial analyst reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a stockholder derivative action brought against the members of the Okta Board of Directors (the "Board" or the "Individual Defendants") for their violations of fiduciary

1

duties and other misconduct, which resulted in substantial damage to the Company and its stockholders.

2.     Okta is an identity and access management company which provides cloud software to aid companies in managing and securing user authentication over multiple applications.

3.     To expand its customers' choices, in March 2021, the Company acquired Auth0, an identity platform geared to addressing application developers' needs, in a transaction valued at $6.5 billion.  Financial analysts questioned whether Okta was paying too much for the company and were concerned about the integration process.

4.     The Company and several of the Individual Defendants repeatedly issued statements reassuring investors that the two companies were integrating seamlessly, and that the Company was increasing sales volume for Okta and Auth0 products. However, in reality, a large number of Auth0 and Okta employees resigned due to mismanagement and a failed integration plan. The upheaval affected sales of Okta and Auth0 products due to a fundamental lack of training and proper management.

5.     The upheaval in the wake of the Auth0 acquisition ultimately led to a substantial breach of trust between Okta and its customers that threatens its business prospects.  Central to Okta's growth and success is data security and maintaining customers' trust.  Despite knowing the importance of maintaining this trust, the Individual Defendants failed to implement internal controls over data security.  The result of this inattention was inevitable and, in January 2022, hackers accessed Okta's servers through an unsecured administrative tool.  Further jeopardizing the trust of its customers, the Company failed to report the breach and the public learned of the data breach from the hackers themselves when they posted screenshots of Okta's internal systems in March 2022.

6.     After the hackers revealed their breach of Okta's systems, the Company was forced to admit that it detected the breach in January but failed to report it for two months.  Analysts downgraded the Company's stock based on the breach of customer trust and failed data security

and the Company's stock dropped 11% in one day.  Ultimately, the Company admitted to making a "mistake" by concealing the breach.

7.      In the wake of these damaging events, a securities class action was filed by aggrieved investors against the Company, its Chief Executive Officer ("CEO"), Defendant Todd McKinnon ("McKinnon"), and other Okta officers.  As such, the Company is now subject to substantial liability and will be forced to expend substantial sums to defend itself and its officers.

8.      Confidential witnesses in the securities class action revealed the extent of the problems integrating Auth0 with Okta and provided further details about the fundamental lack of data security at Okta, which resulted in multiple security breaches in the years prior to the January 2022 breach.  Despite the red flags, the Individual Defendants failed to implement and monitor internal controls over the integration process and data security at the Company.

9.      In August 2022, the Company finally disclosed the integration problems which were causing "confusion in the field, which impacted Okta's "business momentum."  The Company reported that it was lowering its calculated billings outlook for the year by $140 million and a $4 billion revenue target set for 2026, despite recently confirming the Company's ability to meet the revenue target.

10.     As a result of the Individual Defendants' breaches of fiduciary duty and other misconduct, Okta has sustained substantial damages and irreparable injury to its reputation. Through this action, Plaintiff seeks to recover the damages for the Company and remediate the internal control weaknesses that afflict Okta.

11.     Plaintiff did not make a demand prior to bringing this action because it would be futile.  The Company's directors are neither disinterested nor independent.  In the absence of this action, Okta will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.   JURISDICTION AND VENUE

12.     The claims asserted herein arise under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

13.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

14.     This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1931(b), where the Company maintains its headquarters and where it conducts substantial business.

## III.   PARTIES

### A.     Plaintiff

16.     Plaintiff LR Trust purchased Okta stock on December 19, 2020 and has held Okta common stock continuously since that time.  As such, Plaintiff was a shareholder at the time of the transactions complained of herein.

### B.     Defendants

#### 1.     Nominal Defendant Okta, Inc.

17.     Nominal defendant Okta is a company duly incorporated under the laws of the State of Delaware.  Its principal executive offices are located at 100 First Street, Suite 600, San Francisco, California 94105.  Okta's common stock trades on the Nasdaq Stock Market under the symbol "OKTA."

## 2.    Individual Defendants

18.    Defendant McKinnon has served as Okta's CEO and a director since he co-founded the Company in 2009.  McKinnon owns 95,934 Okta shares.  Since 2021, he received the following compensation:

| YEAR | SALARY | STOCK AWARDS | OPTION AWARDS | NON-EQUITY INCENTIVE PLAN COMPENSATION | ALL OTHER COMPENSATION | TOTAL |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2022 | $306,000 | $7,412,097 | $23,899,745 | $165,312 | $37,323 | $31,820,477 |
| 2021 | $306,000 | $6,070,523 | $5,551,843 | $202,646 | N/A | $12,131,012 |

19.    Defendant J. Frederic Kerrest ("Kerrest") has served as Okta's Executive Vice Chairman and Chief Operating Officer since he co-founded the Company with Defendant McKinnon.  Kerrest owns 251,481 Okta shares.  Since 2021, Okta paid Kerrest the following compensation:

| YEAR | SALARY | STOCK AWARDS | OPTION AWARDS | NON-EQUITY INCENTIVE PLAN COMPENSATION | ALL OTHER COMPENSATION | TOTAL |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2022 | $362,585 | $3,706,186 | $11,949,935 | $180,801 | N/A | $16,199,507 |
| 2021 | $362,585 | $4,272,142 | $3,886,309 | $221,630 | $247,917 | $8,990,583 |

20.    Defendant Shellye Archambeau ("Archambeau") is an Okta director since 2018 and a member of the Audit Committee. Archambeau owns 7,802 Okta shares.  Since 2021, Okta paid Archambeau the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|------|------------------------------|--------------|-------|
| 2022 | $42,962 | $200,122 | $283,084 |
| 2021 | $41,685 | $200,138 | $241,823 |

21.    Defendant Robert L. Dixon, Jr. ("Dixon") is an Okta director since 2019 and a member of the Compensation Committee. He owns 2,074 Okta shares.  Since 2021 Okta paid Dixon the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|------|------------------------------|--------------|-------|
| 2022 | $37,500 | $200,122 | $237,622 |
| 2021 | $37,500 | $200,138 | $237,638 |

22.     Defendant Jeff Epstein ("Epstein") is an Okta director since 2021 and Chair of the Audit Committee.  Epstein is an operating partner at Bessemer Venture Partners, a venture capital firm.  He owns 478 Okta shares.  Since 2022, Okta paid Epstein the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2022 | $34,239 | $550,233 | $584,472 |

23.     Defendant Patrick Grady ("Grady") is an Okta director since 2014 and a member of the Audit Committee.  Grady is a managing member of Sequoia Capital, a venture capital firm. Grady owns 107,808 Okta shares.  Since 2021, Okta paid Grady the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2022 | $40,000 | $200,122 | $240,122 |
| 2021 | $40,000 | $200,138 | $237,638 |

24.     Defendant Benjamin Horowitz ("Horowitz") is the Lead Independent Director since 2010.  Horowitz is the co-founder and a general partner at Andreessen Horowitz, a venture capital firm.  Horowitz owns 557,633 Okta shares.  Since 2021, Okta paid Horowitz the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2022 | $50,000 | $200,122 | $250,122 |
| 2021 | $50,000 | $200,138 | $250,138 |

25.     Defendant Rebecca Saeger ("Saeger") is an Okta director since 2019 and a member of the Compensation Committee and Nominating and Corporate Governance Committee. Saeger owns 7,132 Okta shares. Since 2021, Okta paid Saeger the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2022 | $41,500 | $200,122 | $241,622 |
| 2021 | $41,500 | $200,138 | $241,638 |

26.     Defendant Michael Stankey ("Stankey") is an Okta director since 2016.  Stankey is Chair of the Compensation Committee and a member of the Nominating and Corporate Governance Committee.  Stankey is the Vice Chairman of Workday, Inc ("Workday") and formerly served as President and Chief Operating Officer of Workday from 2009 until 2015.

Stankey owns 18,334 Okta Class A shares and 190,000 Okta Class B shares.  Since 2021, Okta paid Stankey the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|------|------------------------------|--------------|-------|
| 2022 | $49,000 | $200,122 | $249,122 |
| 2021 | $49,000 | $200,138 | $249,138 |

## IV.    THE INDIVIDUAL DEFENDANTS' DUTIES

27.    By reason of their positions as officers or directors of Okta and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe Okta and its shareholders, fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Okta in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Okta and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

28.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Okta, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

29.    As officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on the Nasdaq, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning Okta's financial condition, operations, products, internal controls, and business prospects.  In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information.  In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over Okta's management, policies, and internal controls.

30.    At all times relevant hereto, the Individual Defendants were the agents of each other and Okta and were always acting within the course and scope of such agency.

7

31.     The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Okta.

**A.      Duties Under Okta's Code Of Conduct**

32.     Okta's Code of Conduct applies to "directors, officers, employees and contractors of Okta, Inc. and its subsidiaries."

33.     The Code of Conduct emphasizes that managers must "lead[] by example" and hold themselves to the "highest ethical and professional standards."

34.     The Code of Conduct requires the investigation of any misconduct reported: "We will investigate any reports of violations of the Code or the law, as warranted, and reports will be addressed with appropriate sensitivity and confidentiality."

35.     The Code of Conduct discusses employee obligations in relation to financial integrity and accurate recordkeeping:

> The integrity, reliability, and accuracy in all material respects of Okta's books, records and financial statements are fundamental to our continued business success. You must accurately and truthfully document each business transaction. You may not cause Okta to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner.

36.     The Code of Conduct mandates compliance with laws, rules, and regulations applicable to Okta's business dealings:

> We strive to conduct our business in compliance with all applicable laws, rules and regulations…. You may not engage in any unlawful activity in conducting Okta's business or in performing your day-to-day company duties, nor should you instruct others to do so.  You are obligated to conduct business ethically and to use good judgment.

37.     The Code of Conduct stresses directors', officers', and employees' responsibility for ensuring legal compliance with requirements to safeguard customer data:

> We make commitments to protect customer data, personal data, confidential information and the systems that process such data. All personnel are expected to follow global privacy laws, secure, access, use and share personal data only in accordance with the law and our policies, and honor individuals' choices with respect to their personal and confidential data.

38.     The Code of Conduct discusses the ramification of the failure to protect customer's private information including "significant liability for us and loss of trust from our customers."

39.    The Code of Conduct obligates accurate, complete, and consistent communication of information relating to the Company and its operations: "Our commitment to building and maintaining a strong reputation and brand means that all information disseminated outside of Okta (for example, to the media, investors or the general public) must be accurate, complete, and consistent."

**B.    Additional Duties Of Audit Committee Members**

40.    The Audit Committee Charter sets forth additional duties for members of the Audit Committee and provides that members are obligated to assist the Board in its oversight of, among other things, systems of disclosure controls and procedures, as well as the quality and integrity of the Company's financial statements and reports.

41.    The Audit Committee is also obligated to oversee and monitor significant operating and control issues:

- Review with management and the Company's auditors, to the extent appropriate, earnings press releases, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies.

- Review and discuss with management and the Company's auditors, as appropriate, the Company's guidelines and policies with respect to financial risk management and financial risk assessment, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures.

- Confer with management and the Company's auditors, as appropriate, regarding the scope, adequacy, and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures, including any significant deficiencies and significant changes in internal controls.

- Adopt procedures, when and as required by applicable laws and rules, for the receipt, retention and treatment of complaints received by the Company regarding (i) accounting, internal accounting controls or auditing matters and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters…(iii) potential violations of the U.S. federal securities laws, including any rules and regulations.

- At least annually, to review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws, rules and regulations, as well as to its Code of Conduct.

- To report to the Board with respect to material issues that arise regarding the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements.

- To review, with the Company's counsel, legal compliance and all actual, pending or threatened legal matters that could have a significant impact on the Company's business, prospects or financial statements or as otherwise deemed appropriate by the Committee. To review, with management, the Company's finance function, including its budget, organization and quality of personnel.

**C.    Additional Duties Of Nominating And Corporate Governance Committee Members**

42.    The Charter of the Nominating and Corporate Governance Committee sets forth additional duties for its members, including obligations to "[d]evelop and recommend to the Board a set of corporate governance guidelines" and "[r]eview and reassess the adequacy of the Corporate Governance Guidelines periodically and recommend any proposed changes to the Board for approval."

**V.    SUBSTANTIVE ALLEGATIONS**

**A.    Background**

43.    Okta, founded in 2009 by Defendants McKinnon and Kerrest, is a data security company focused on providing identity security for organizations to allow "any person to safely use any technology," through the "secure front door of their digital world." Since 2009, Okta has worked with some of the world's most "innovative companies."[1]

44.    Okta touts the use of a single ID to log into multiple software systems, thus simplifying and securing a user's digital identity. The Company's primary platform is the Okta Identity Cloud, which allows its customers to have "simple and secure access" to the technology and services to do their work.[2] Okta's products and offerings include, among others, Simple Sign-On ("SSO") and adaptive Multifactor Identification.

45.    Okta employs a Software-as-a-Service business model with multi-year subscriptions for the use of its cloud platform. Subscriptions provide clients with the ability to use

---

[1]    https://www.okta.com/company/ and accompanying video.

[2]    https://www.cdw.com/content/cdw/en/brand/okta.html

Okta's Identity Cloud to integrate with nearly any application, service or cloud that they choose through a secure, reliable and scalable platform and cloud infrastructure.

46.     User growth and retention were the keys to expanding profits and increasing market share.  In the Company's most recent Annual Report on Form 10-K filed with the SEC on March 7, 2022 (the "2022 10-K"), the Company discussed its growth strategy which includes driving new customer growth and "cross-selling and up-selling additional and new products" to existing customers.  While Okta sells its products directly to customers through its sales team, the Company also indirectly markets its products through a network of channel partners, including "resellers, system integrators and other distribution partners."

47.     On March 5, 2021, the Company filed with the SEC a Current Report on Form 8-K attaching a press release announcing a definitive agreement to acquire Auth0, a leading identity platform for application teams, in a stock transaction valued at approximately $6.5 billion.  In the press release, Defendant McKinnon explained that the purpose of the acquisition was to provide access to identity security for application developers through Auth0's platform:  "Combining Auth0's developer-centric identity platform with the Okta Identity Cloud will drive tremendous value for both current and future customers."

48.     In an interview, [3] Defendant McKinnon defended the steep price tag of the acquisition, explaining that the two companies were complementary.  While Okta offers customers pre-built, pre-configured solutions for securing their identity, Auth0 would help to expand Okta's $25 billion customer identity market by offering customers more flexibility and versatility in customizing their security needs.  According to McKinnon, Okta sells from the top down – to chief information officers or technical leaders.  Auth0, on the other hand, focuses on appealing to developers who are creating a secure interface for businesses to interact with their customers.  McKinnon touted the acquisition as a way to give customers "great choice and great value."

---

[3]     CNBC Television, *Okta CEO Defends Move to Acquire Rival Cybersecurity Firm Auth0,* https://www.youtube.com/watch?v=kJCtQtEj810.

49.     A March 3, 2021 *Forbes* article quoted McKinnon describing the deal as part of the Company's push to be one of the "five or six primary clouds" that customers view as market leaders along the likes of Microsoft, Salesforce, and Zoom.[4]

50.     Utilizing Auth0's resources, McKinnon announced new products which would better protect users against identity theft in the wake of sophisticated cyber-attacks like that involving SolarWinds Corp.[5]   According to McKinnon, quoted in a *Bloomberg* article in April 2021, "[a] lot of these data breaches come down to server accounts that weren't locked down when they should have been—admins changed jobs or left the company," noting that "if it wasn't the cause of the breach, it was a vector that the attackers used once they got in."[6]

51.     McKinnon stated that the Company would grow by 30% in each of the next three years with the expanded market share from Auth0.[7]

52.     On May 3, 2021, Okta filed with the SEC a Current Report on Form 8-K attaching a press release announcing the successful completion of the Auth0 acquisition.

**B.      The Individual Defendants Knew The Material Risks Regarding Okta's Core Operations**

53.     On March 4, 2021, the Company filed with the SEC its Annual Report on Form 10-K (the "2020 10-K").   The 2020 10-K disclosed the risks resulting from the Auth0 acquisition, such as a failure to properly integrate with the company:

---

[4]     Alex Conrad, March 3, 2021, https://www.forbes.com/sites/alexonrad/2021/03/03/okta-acquires-auth0-in-6-billion-all-stock-deal/?sh=571443114a89.

[5]     SolarWinds provides system management tools for network and infrastructure monitoring. One of SolarWinds's monitoring systems, Orion, was hacked in 2019 and hackers gained access to data from more than 30,000 public and private organizations -- including local, state and federal agencies – who utilized the Orion network management system.

[6]     Dina Bass, *Okta Expects 30% Annual Growth to 2024, Boosted by New Markets,* April 27, 2021,  https://www.bloomberg.com/news/articles/2021-04-07/okta-expects-30-annual-growth-to-2024-boosted-by-new-markets.

[7]     *Id.*

***We may not realize potential benefits from the Acquisition because of difficulties related to integration, the achievement of synergies, and other challenges.***[8]

We and Auth0 have operated and, until completion of the Acquisition, will continue to operate, independently, and there can be no assurances that our businesses can be combined in a manner that allows for the achievement of substantial benefits. Any integration process may require significant time and resources, and we may not be able to manage the process successfully as our ability to acquire and integrate larger or more complex companies, products or technologies in a successful manner is unproven. If we are not able to successfully integrate Auth0's businesses with ours or pursue our customer and product strategy successfully, the anticipated benefits of the Acquisition may not be realized fully or may take longer than expected to be realized. Further, it is possible that there could be a loss of our and/or Auth0's key employees and customers, disruption of either company's or both companies' ongoing businesses or unexpected issues, higher than expected costs and an overall post-completion process that takes longer than originally anticipated.

54.     In the 2020 10-K, the Company disclosed the heightened risks that Okta faced as an attractive target for data breaches:

Increasingly, companies are subject to a wide variety of attacks on their systems and networks on an ongoing basis…. As a well-known provider of identity and security solutions, ***we pose an attractive target for such attacks***. The security measures we have integrated into our internal systems and platform, which are designed to detect unauthorized activity and prevent or minimize security breaches, may not function as expected or may not be sufficient to protect our internal networks and platform against certain attacks. In addition, techniques used to sabotage or to obtain unauthorized access to networks in which data is stored or through which data is transmitted change frequently, become more complex over time and generally are not recognized until launched against a target. As a result, we and our third-party service providers may be unable to anticipate these techniques or implement adequate preventative measures quickly enough to prevent either an electronic intrusion into our systems or services or a compromise of customer data, employee data or other protected information.

**C.     Okta's Business Is Dependent On Data Security And Customers' Trust In The Company**

55.     The Company acknowledges on its website that customers' trust in the platform is critical to the Company's business plan. The Company readily admits that ***"[o]ur brand is built upon Trust***, and our customers count on us to uphold that promise. ***Nothing is more important than the reliability and security of our service."***[9] In a recent interview, Defendant Horowitz

---

[8]        Emphasis in original. All emphasis herein is added unless otherwise stated.

[9]        Okta website, https://trust.okta.com/.

commented on how trust was a "big component" of Okta's early culture, remarking that it was a "big thing" for Defendants McKinnon and Kerrest.[10]

56.     On February 18, 2021, Defendant McKinnon published a blog post on the Company website[11] discussing a report released by the Company. The report surveyed 15,000 office workers around the world to learn more about their trust in the digital economy and found that two main factors impact people's trust in a digital brand, *i.e.,* reliability and security. Further, the report found that trust directly affected consumer purchasing decisions. According to the survey, 75% of U.S. respondents said they were unlikely to purchase from a digital brand they did not trust and if a brand misuses data or experiences a data breach, 47% of U.S. respondents said they would permanently stop using the company's services.

57.     In an October 13, 2021 press release,[12] Atul Bahl, the Company's Vice President of Cloud Infrastructure, stated:

> **As a data-focused organization, security is of the utmost importance to us.** Okta's Custom Administrator Roles allow us to follow the principle of least privilege and only grant admins access to the tasks they need to perform across our many business units. We save time for our internal teams and **ensure the best-in-class security of our customer applications**.

**D.     The Individual Defendants Mislead Investors Regarding The Integration With Auth0 And The Retention Of Auth0 and Okta Employees[13]**

58.     On March 3, 2021, in a fourth quarter earnings call with financial analysts and investors, Defendant McKinnon stated that Okta's and Auth0's "platforms are already integrated

---

[10]     Andreessen Horowitz website, *Ben Horowitz on How the Best Leaders Build Culture,* August 19, 2022, https://a16z.com/2022/08/19/ben-horowitz-on-how-the-best-leaders-build-culture/

[11]     Okta website, *State of Digital Trust: How the Virtual Economy Changed Consumer Behavior,* https://www.okta.com/blog/2021/02/state-of-digital-trust-how-the-virtual-economy-changed-consumer-behavior/.

[12]     Okta Website, https://www.okta.com/press-room/press-releases/okta-advances-customer-identity-with-auth0-and-new-okta-features/.

[13]     While Plaintiff and its undersigned attorneys have conducted their own independent investigation of the wrongdoings alleged herein, the Confidential Witness ("CW") allegations

somewhat," and brushed off analysts' concerns about the complexity of the integration.  However, according to confidential witnesses cited in the securities class action complaint, former employees of Okta, senior employees from both companies resigned after the acquisition.  CW1, part of Okta's merger and acquisition team, stated that Okta promoted a number of its own employees around April 2021 in anticipation of the acquisition.  Consequently, a number of senior Auth0 employees resigned right before the merger of the two companies or shortly thereafter, assuming that they would be laid off because their positions would be taken by the promoted Okta employees.  A number of Auth0 employees were placed into positions they did not want or were downgraded to lower positions because they were not needed at their previous positions.

59.   CW1 described how the Okta leadership used language such as merger versus acquisition and other such terms to falsely assure Auth0 employees of the security of their jobs.  CW1 noted that she viewed the entire acquisition process as a "bait and switch."  CW1 recalled an August 2021 internal letter from Eugenio Pace, Auth0's CEO, that announced that senior leadership was leaving the Company.  The executives who left included the Chief Legal Officer, Chief Financial Officer, Chief Human Resources Officer, and a few months after the acquisition, the Chief Revenue Officer.  Okta was forced to offer steep retention bonuses to keep employees from abandoning ship.

60.   CW4[14] added that the President of Worldwide Field Operations at Okta, Susan St. Ledger ("St. Ledger"), joined not long before the acquisition, and her team did not integrate well.  St. Ledger and Okta Chief Revenue Officer ("CRO") Steve Rowland ("Rowland") pushed out all the "founding fathers" of Okta and other employees that helped build the Company from the ground up, firing approximately 75-80% of the original senior staff.  Ledger and Rowland then

herein are based upon allegations contained in the securities class action complaint (*see*, §H, below).

[14]   CW4 was employed by Auth0 before the acquisition and stayed on until the first quarter of 2023.

15

brought in their own people to fill the positions, which created further upheaval, as CW5[15] pointed out, because the new hires did not know Okta's products and market well.

61.     CW6[16] noted the novelty of the acquisition in Okta's portfolio because Okta had only previously acquired stand-alone tools which easily integrated into Okta's platform. Auth0 and Okta's platform were like "night and day," according to CW6. CW6 questioned if the two platforms could *ever* be fully integrated based on their stark differences. The Company gave little training regarding Okta and Auth0 products, which hampered sales.

62.     On the other hand, CW4 recalled that customers were confused because of the similarities between Okta and Auth0, which resulted in lost sales.

63.     On September 1, 2021, the Company filed with the SEC a Current Report on Form 8-K attaching a press release announcing the second quarter financial results. In the press release, Defendant McKinnon touted the fact that "[i]n our first quarter as a combined company with Auth0, *we're off to a fantastic start,*" failing to disclose the stream of high-level employees that jumped ship shortly before and after the acquisition. McKinnon emphasized the success of the integration in an earnings call with financial analysts that day, stating: "when you think about us plus Auth0, *it is going very well.*" McKinnon further commented on the speed of the integration: "It's been less than four months since we closed the acquisition …but we've already made a lot of progress and learnt quite a bit." McKinnon and Kerrest discussed the importance of integrating the sales teams from the two companies, with McKinnon explaining that the "unified sales team" would be able to "sell both platforms and benefits customers by providing more options to meet their unique use cases." Kerrest praised the sales teams' integration with "[a] lot of great communication." McKinnon pointed out the limited amount of overlapping customers and the ability to match up the appropriate platform for each customer:

---

[15]     CW5 was an Okta account executive for over three years.

[16]     CW6 was a Senior Solutions Engineer at Okta from February 2019 through December 2021, working to support the sales team and had access to Okta's SuperUser systems.

And the first thing is we only have 300 overlapping customers.  So if these 2 CIAM[17] platforms that were—if it was just about like 2 competitors going after the same small pie, you would have had a way more overlap in terms of customers or at least the competitive pipeline, and we haven't seen that materialize.  You only have 300 companies that are overlapping customers.

And then the pipeline reviews, it's very clear which CIAM platform, Okta CIAM or the Auth0 CIAM platform should be targeted for which customer.  So this is not confusing in the field.  They're figuring it out.

64.     A JPMorgan analyst asked McKinnon what the Company would do "to make sure that you retain the people you really want to go forward with," noting that "this is the point where you get that uncertainty if you're a salesperson for Auth0, Okta wondering what's going to happen to your territory, your job…."  McKinnon dodged the question, concealing the mass exodus of high-level employees:

As we walked through this integration process, we've worked really hard to be open about it even when we didn't have all the answers.  And I think that helps a lot…. **So it's an important point you bring up, and those are some of the things we're thinking about as we go forward**.

65.     The original integration plan involved the integration of the sales and marketing teams at each company, referred to along with other teams as the go-to market teams.  CW2, a former employee at Auht0 and Okta that was "intimately involved" with the integration,[18] explained that the integration of the teams involved using Auth0 employees as "specialists" to train Okta employees on the Auth0 platform for a year with a sole focus on Auth0 products.  Additional Okta staff would concentrate on Okta's offerings.  This portion of the integration was supposed to occur on February 1, 2022 but was delayed significantly.  According to CW2, several Auth0 and Okta senior executives approved the plan and conducted weekly calls regarding its implementation.  CW2 named Defendant McKinnon as the "executive sponsor" of the plan, with Okta President St. Ledger and CRO Rowland participating as well.

---

[17]     Customer Identity & Access Management (CIAM) systems are designed to manage and protect external identities.

[18]     CW2 stated that she spent eight hours per day over a period of six or seven moths crafting the integration plan.

66.     Okta attempted to follow an integration plan despite all the upheaval, but according to CW2, the plan did not "go well at all" and was a "complete nightmare."

67.     CW3[19] explained that everyone in sales was "struggling" because of the upheaval and the majority of CW3's team, including CW3, only met about 20% of their sales quota. CW3 added that a few customers were interested in Auth0's products, but Okta's products were not selling well at the time.

68.     CW1 stated that Okta misstated how long it would take to integrate the new company, leaving existing employees to balance their existing responsibilities and integration tasks which was untenable.   CW5 said that executives such as St. Ledger and Rowland micromanaged sales staff, fundamentally changed the customer segment structure, and restricted visibility into revenue figures.

69.     On December 1, 2021, Okta filed with the SEC a Current Report on Form 8-K attaching a press release announcing the financial results for the third quarter. In the press release, McKinnon claimed an issue-free integration:  "***We're maintaining the momentum of both Okta and Auth0 and are making great progress on the integration***."  Later, on an earnings call with financial analysts, Defendant Kerrest confirmed that "[w]e are doing very well in the integration efforts."

70.     Defendants McKinnon and Kerrest discussed more details of the integration including the integration of the sales force, which according to Kerrest was "going well:"

> And now another key piece of the puzzle, as you just mentioned, is the sales forces. They will be fully integrated come Feb 1, which is 2 short months from now when we kick off the new fiscal year.  It'll all be under one umbrella….  We already are doing a lot of work around territory management, around education, around getting all the new folks ramped on now the broader suite of products that they're going to have to offer.

71.     McKinnon also provided February 1, 2022, as the expected date for full integration and explained that proper execution of the integration was critical to "extend our lead in that market."

---

[19]     CW3 was an Okta Corporate Account Executive from December 2021 until August 2022.

72.     Despite McKinnon and Kerrest's statements, following a review of the integration in late 2021 by Okta's finance team, the entire plan was scrapped because there was "no way" that the integration plan could meet its goals and it was not "humanly possible" to complete it in time.[20] CW2 recalled that the plan was shut down in December 2021, but employees were not informed that the plan was obsolete until two weeks before it was supposed to go into effect.

73.     In an earnings call with financial analysts on March 2, 2022, Defendant Kerrest responded to a question about integration progress, noting the Company was "very excited about the integration." McKinnon emphasized the success of the unified sales team which had "synergy" and focused on how the Company was increasing capacity" on what it could sell because "***all of the Okta reps can sell all the products***."

74.     McKinnon noted that while there were "a couple more pieces we need to finish up in terms of ticking and tying some of the systems on the back end," those last steps "were just to make sure that we're working as one organization going forward."

### E.     The January 2022 Data Breach

#### 1.     A Breach Of Okta's Systems Is Disclosed By The Hackers And Okta Fails To Adequately Respond To The Breach

75.     On January 21, 2022, hackers known as "LAPSUS$" were able to breach Okta's servers after they compromised one of the Company's third-party support vendors, Sykes, a subsidiary of Sitel. The hackers were able to view information from Okta's active virtual servers.

76.     On March 21, 2022, LAPSUS$ posted screenshots on their telegram channel of Okta's internal company environment. The Company was forced to address the breach and on March 22, 2022, Defendant McKinnon posted the following statement on his Twitter account:

> In late January 2022, Okta detected an attempt to compromise the account of a third-party customer support engineer working for one of our subprocessors. The matter was investigated and contained by the subprocessor.

---

[20]     Securities Complaint at ¶81.

We believe the screenshots shared online are connected to this January event. Based on our investigation to date, there is no evidence of ongoing malicious activity beyond the activity detected in January.

77.    In an official statement issued through a blog post; the Company admitted that the Company had detected the breach in January but failed to report it for two months. In an updated blog post, the Company stated that "approximately 2.5%" of Okta's customers were affected by the breach, which seemed like a small number, but media reports later pointed out that the Company has "over 15,000 customers, according to its website."

78.    Okta stated that it did not report the breach immediately because it "did not know the extent of the Sitel issue" noting that "[a]t that time, we didn't recognize that there was a risk to Okta and our customers," driving home the lack of internal controls at the Company. The Company admitted that "[w]e should have more actively and forcefully compelled information from Sitel."

79.    Analysts, such as Raymond James downgraded Okta from a "strong buy" to "market perform" based on, among other things, "the handling of its latest security incident."

80.    On March 23, 2022, as a result of Okta's update on the breach and the analyst downgrade, the Company stock fell $17.88 per share, nearly 11%, to close at $148.44 per share.

81.    On March 25, 2022, the Company admitted to making a "mistake" by concealing the breach. A *Wall Street Journal ("WSJ")* article quoted[21] Truist analyst Joel Fishbein who also downgraded Okta to a hold rating, stating that "damage to the Okta brand, which is regarded as one of the strongest defense names in the industry, is concerning."

82.    Okta's customers harshly criticized the Company for its handling of the security breach. For example, the Chairman and CEO Of Tenable stated in a LinkedIn post: "Two months is too long. This compromise should have been disclosed when Okta detected it in January or after a competent and timely forensic analysis."

---

[21]    Dan Gallagher, *Okta Faces Long Road Back*, March 25, 2022, https://www.wsj.com/articles/okta-faces-long-road-back-11648211400.

83.     According to CW3, the data breach was discussed at the first All-Hands meeting following the public disclosure.  Employees at the meeting were told that the hackers infiltrated Okta just to show it was possible and even utilized the Company's internal Slack channel during the breach.  The Company reported that they were losing sales because of the breach and the Company distributed "talking points" to employees to respond to customers' concerns.  CW4 confirmed that many prospective customers were lost because of the breach.

84.     On December 2, 2022, the Biden administration announced it would investigate the hacks carried out by Lapsus$, through the U.S. Cyber Safety Review Board.[22]  A *WSJ* article about the investigation noted that the hacker group "has often relied on bypassing commonly used security tools popular across industries to breach a range of networks, ***exposing major, overlooked security gaps in interwoven software ecosystems.***"

### 2.     Security Breach In Okta's Administrative Tools Leads To The Hack

85.     Despite assurances to the contrary, Okta and the Individual Defendants failed to properly secure the Company's administrative tools, exposing customer data to hackers.  For example, according to CW6, Okta had a "SuperUser tool" that allowed engineers and customer support to control and monitor customer tenants or virtual servers.[23]  The tool essentially gave customers access to any virtual server run by Okta anywhere in the world.  These servers had few restrictions and there was no formal request or vetting process for becoming a SuperUser.

86.     The ability to access the SuperUser network of servers was granted by Okta managers.  Due to the mass exodus of employees due to the Auth0 acquisition, CW6 stated that the newer managers were not well trained and handed out access to the SuperUser tool "like

---

[22]     Dustin Voltz, *U.S. to Probe Cyberattacks Linked to Lapsus$, The Wall Street Journal*, https://www.wsj.com/articles/u-s-to-probe-cyberattacks-linked-to-lapsus-11669991436.

[23]     "Tenants" refer to a customer's space within Amazon Web Services or virtual servers which were accessed by Okta personnel for troubleshooting and monitoring purposes.

candy." On many occasions Okta Solutions Engineers would give customers free trials to try out SuperUser and then forget to end the free trials when it expired.

87.    CW6 explained that Okta should have "sandboxed" a powerful tool like SuperUser, "through adding additional layers of security or by restricting access to specific people. Options to monitor access to the tool through a designated administrative station or other controls were available to the Company but were never employed. Using additional safeguards is considered "best practice" in the industry and failing to employ these safety measures opens the door for a hacker to gain access through a user's VPN account. CW7[24] confirmed that Okta did not properly secure its administrative tools and that it seemed too easy for anyone to access the tools without vetting. CW7 pointed out that Okta did not provide much training on being a SuperUser and the implications of such access.

88.    Okta also did not require third parties, such as Solutions Engineers, to comply with Okta's standard security requirements, such as using multiple systems to safeguard identity information.

**F.    Okta Continues To Mislead Investors About Customer Retention And Revenue Goals**

89.    On June 2, 2022, in an earnings call with financial analyst about the financial results for the first quarter, Defendant McKinnon responded to a question about the progress of the sales integration, remarking that "we've made great progress as a combined company" and "we're in good shape."

90.    On June 8, 2022, McKinnon had an interview with James Cramer and was asked directly about maintaining customer trust following the breach. McKinnon assured that the Company had "conversations" with over 1,000 customers to work on instilling trust and stated that the Company was confident that it has "been able to do that."

91.    In the interview, McKinnon confirmed the Company's ability to meet growth targets:

---

[24]    CW7 was an Okta Senior Solutions Engineer from January 2020 through March 2021.

We're committed to making this a $4 billion a year company by [] fiscal year 26…. We've always made sure that our, that our growth rate and our [*sic*] and our cash flow generation was balanced towards that goal.  So, we think we're drawing the right balance to capture this market opportunity.  And I think over time you're going to see a very highly scaled profitable company that's going to help customers and capitalize on this big market opportunity.

**G.    Integration Problems And Okta's Stagnant Growth Are Disclosed**

92.    On August 31, 2022, in an earnings call with financial analysts and investors to discuss the second quarter financial results, the Company finally disclosed the ongoing integration problems.  Defendant McKinnon stated that financial results were "mixed" because of the "impact from the integration of the Okta and Auth0 sales team."  McKinnon focused on the "***heightened attrition*** within the go-to-market organization as well as some ***confusion in the field, both which have impacted our business momentum.*"  McKinnon announced that the Company was acting to "stem attrition" through, among other things, "making changes to [the] organizational structure," and engaging in "increased sales training and enablement."

93.    McKinnon further elaborated on the integration issues: "I think the headwinds are really about how do you take those hundreds and hundreds of reps and make them productive selling both customer identity cloud and workforce identity cloud…."

94.    McKinnon admitted that the Company needed to reevaluate its $4 billion revenue target for 2026 "given the short-term changes that we're optimizing for the customer."  McKinnon blamed the revaluation on the integration which involved "6 months of information and learning" and the mass attrition and forced the Company to get "back on track to achieve this strategic imperative."

95.    Okta's Chief Financial Officer ("CFO") Brett Tighe disclosed that the Company was also "lowering our calculated billings outlook for the year by approximately $140 million due to the outlook headwinds outlined earlier."

96.    Following the Company's disclosures, the price of Okta's stock dropped precipitously, falling $22.5 per share or over 24% in one day, to open at $69.15 on September 1, 2022.

97.    In a follow-up interview on September 1st with *TechCheck*, [25] Defendant McKinnon pointed out Okta's "near-term challenges" impeding its fiscal 2026 targets including "higher-than-average attrition in the sales team."

98.    At the close of trading on September 1, 2022, the Company's stock fell an additional $8.55 per share or over 12%, to close at $60.60 per share.

**H.    Okta Is Sued In A Securities Class Action Lawsuit**

99.    On May 20, 2022, a securities class action lawsuit was filed in the United States District Court for the Northern District of California against the Company, Defendant McKinnon, and other Okta officers, captioned *City of Miami Fire Fighters' and Police Officers' Retirement Trust v. Okta, Inc., et al*, No. 3:22-cv-02990-SI (N.D. Cal.), alleging violations of Sections 20 (a) and 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

100.   On October 13, 2022, an amended complaint was filed (the "Amended Securities Complaint"). The Amended Securities Complaint seeks damages on behalf of all persons and entities who purchased or otherwise acquired Okta Class A Common Stock between September 1, 2021, through September 1, 2022, inclusive.   The plaintiff asserts that the defendants made false and misleading statements and omissions which gave the impression that there were no undisclosed material risks relating to the Auth0 integration and the Company's ability to maintain data security despite Okta's and its executives' knowledge of facts to the contrary.

**I.    The Individual Defendants Ignored Red Flags**

101.   Financial analysts warned that the Company would face an uphill battle to integrate Auth0 and questioned if the deal was worth the price tag.

102.   Mizuho Securities, in a report on April 8, 2021, gave Okta a Neutral rating, in part because of "some questions" about the acquisition, stating that the "large acquisition" "doesn't tangibly expand [Okta]'s TAM, [26] and there remain unanswered questions as to how [Okta] and

---

[25]    Https://podcasts.apple.com/us/podcast/four-ceos-break-down-their-q2-results-oktas-todd-mckinnon/id1561685780?i=1000578063081.

[26]    Total Addressable Market is a measure used to determine potential growth of a company.

Auth0 will navigate go to market activities, including deal conflict that we believe will be inevitable at times."

103.    On March 3, 2021, JPMorgan discussed investors' concerns about the deal: "Investors are trying to better understand the need to acquire a customer identity and access management (CIAM) vendor when Okta already had offerings in the market. And they are also digging into the valuation paid."

104.    The Company also experienced several security breaches starting from as early as October 2021, which should have served as red flags to the Individual Defendants because the security incidents exposed the vulnerabilities of the Company's security systems and protocols.

105.    CW9 had personal information stolen while working for Okta and her VPN account was compromised.  CW9 only learned of the breach because a third party reached out with her personal VPN account information and warned her that she had been hacked. When CW9 reported the incident, the Company said it was the result of "human error" and weakly reassured that "we don't believe that the information will be misused by the unauthorized third party."  CW9 described security breaches involving other employees' information and recalled that Okta's VP of Cybersecurity Timothy McIntyre ("McIntyre") reached out to the human resources ("HR") departments or the heads of the regional offices regarding the incidents.  CW9 was asked by HR and McIntyre not to tell anyone about the incident.  When CW9 attempted to learn about the extent of the breach, she was constantly rebuffed and told the Company was "investigating."  Only after she left Okta[27] did she learn that her personal email, passwords, and salary information had been stolen.

106.    In violation of their fiduciary duties, the Individual Defendants ignored these red flags.  Had the Individual Defendants timely acted the damage to Okta pled herein would not have occurred or at least would have been minimized.

---

[27]    CW9 worked at Okta from November 2020 through December 2021.

**J.      Okta's False And Misleading Proxy Statement**

107.      On May 10, 2022, the Company filed with the SEC its 2022 Proxy Statement soliciting shareholder votes to, among other things, re-elect Defendants Epstein, Kerrest, and Saeger, to the Board and approve executive compensation.  The Proxy Statement was issued by the order of the Board and signed by Defendant McKinnon.

108.      The 2022 Proxy Statement represents that the Board oversees and monitors the Company's risk exposures:

> Risk is inherent in every business and we face a number of risks, including, among others, strategic, financial, business and operational, macroeconomic, cybersecurity, legal and regulatory compliance and reputational risks.  We have designed and implemented processes to manage risk in our operations, including our enterprise risk management program.
>
> [O]ur board, as a whole and assisted by its committees, has responsibility for the oversight of risk management, including our enterprise risk management program. In its risk oversight role, our board has the responsibility to satisfy itself that the enterprise risk management processes our management team has designed and implemented are appropriate and functioning as designed.  To that end, our board believes that open communication between our management team and our board is essential for effective risk management and oversight.  Our CEO and other members of the senior management team attend quarterly meetings of our board, as well as such other meetings as the board deems appropriate, where, among other topics, they discuss strategy and risks facing the company.  In this respect, our full board reviews strategic and operational risk in the context of reports from our management team, receives reports on all significant committee activities at each regular meeting, and evaluates the risks inherent in significant transactions and events.

109.      The 2022 Proxy Statement represents that the Company is committed to good corporate governance practices to benefit stockholders:

> Our business and affairs are managed under the direction of our board, which is elected by our stockholders.  In carrying out its responsibilities, our board selects and monitors our top management, provides oversight of our financial reporting processes, and determines and implements our corporate governance policies.
>
> Our board and management team are committed to good corporate governance to ensure that Okta is managed for the long-term benefit of our stockholders, and we have a variety of policies and procedures to promote such goals.  To that end, during the past year, our management periodically reviewed our corporate governance policies and practices to ensure that they remain consistent with the requirements of the Sarbanes-Oxley Act of 2002, SEC rules and Nasdaq listing standards.

110.     The foregoing statements in the 2022 Proxy Statement were false and misleading and omitted material information.  Contrary to the representations made in the Proxy, the Board was required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Okta's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's integration with Auth0 and the vulnerabilities of the Company's security systems.

111.     On June 24, 2022, Okta filed with the SEC a Current Report on Form 8-K announcing, among other things, the reelection of Defendants Epstein, Kerrest, and Saeger, and the approval of executive compensation, pursuant to the solicitations in the 2022 Proxy Statement.

## VI.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

112.     Plaintiff brings this action derivatively and for the benefit of Okta to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Okta, gross mismanagement, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

113.     Okta is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

114.     Plaintiff is, and has been at all relevant times, a stockholder of Okta and was a stockholder of the Company at the time of the transactions alleged herein.  Plaintiff will adequately and fairly represent the interests of Okta in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

115.     Demand upon the Board to institute this action against the Individual Defendants would be futile and is, therefore, excused.  The Board is neither disinterested nor independent.

1

2

3

**A.      Demand Upon Defendant McKinnon Is Excused**

116.      Defendant McKinnon is the co-founder and CEO of Okta.  McKinnon therefore is not independent.  Indeed, Okta's 2022 Proxy Statement does not list McKinnon as an independent director.

4

5

6

7

117.      As an employee of Okta, the Company provides Defendant McKinnon with his principal occupation from which he receives substantial compensation, including $31,820,477 in 2022 and $12,131,012 in 2021.  Thus, McKinnon could not consider a demand for action that might require him to sue the directors who control his continued employment or fellow members of management with whom he works on a day-to-day basis.

8

9

10

11

12

13

118.      McKinnon will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  As of April 1, 2022, McKinnon beneficially owns 95,934 Okta Class A shares and 7,634,799 Class B shares, giving him 31.4% of the Company's voting control.  If McKinnon acknowledged that he, Okta, or others engaged in misconduct, his investment in Okta would be substantially devalued and his lucrative position jeopardized.  Further, if McKinnon acknowledged that executives at Okta had engaged in the wrongdoing alleged, he would be acknowledging that he, as CEO of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

14

15

119.      Defendant McKinnon is named as a defendant in the pending securities class action.  As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

16

17

120.      McKinnon signed the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

18

19

20

121.      Defendant McKinnon and Defendant Grady have a business relationship which precludes them from acting in an independent and disinterested manner.  Defendant Grady is a managing member of Sequoia Capital ("Sequoia"), a venture capital firm.  Sequoia is a close investment partner with Okta.  For example, Sequoia led a $75 million Series E investing round in

21

Okta in 2014.[28]  McKinnon served as a consultant for the venture capital firm, advising Grady and Sequoia on potential investments.  Grady praised McKinnon's candor and described how he saved Sequoia from a bad investment through his "super-candid and super-clear" nature.[29]

122.    Further, Defendant McKinnon and Defendant Kerrest have a long-standing business relationship which precludes them from acting in an independent and disinterested manner.  The two worked together for years at Salesforce, Inc. before serving on Okta's Board.

123.    McKinnon, as a director of Okta, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Okta's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's integration with Auth0 and the vulnerabilities of the Company's security systems.

124.    McKinnon is neither disinterested nor independent.  Any demand upon Defendant McKinnon is futile and, thus, excused.

**B.    Demand Upon Defendant Kerrest Is Excused**

125.    Kerrest has served as Okta's Executive Vice Chairman and Chief Operating Officer since the Company's inception.  Kerrest therefore is not independent.  Indeed, Okta's 2022 Proxy Statement does not list Kerrest as an independent director.

126.    As an employee of Okta, the Company provides Defendant Kerrest with his principal occupation from which he receives substantial compensation, including $16,199,507 in 2022 and $8,990,583 in 2021.  Thus, Kerrest could not consider a demand for action that might

---

[28]    Rachel King, *Cloud ID Management Startup Okta Raises $75 Million, The Wall Street Journal*, https://www.wsj.com/articles/BL-CIOB-4697 (updated June 14, 2014).

[29]    Mory Stettner, *Okta CEO Todd McKinnon Shines Spotlight On Unsung Heroes, Investor's Business Daily*, October 31, 2019, https://www.investors.com/news/management/leaders-and-success/okta-ceo-todd-mckinnon-shines-spotlight-on-unsung-heroes/.

require him to sue the directors who control his continued employment or fellow members of management with whom he works on a day-to-day basis.

127.    Kerrest will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  As of April 1, 2022, Kerrest beneficially owns 251,481 Okta Class A shares and 2,799,043 Class B shares, giving him 12.1% of the Company's voting control.  If Kerrest acknowledged that he, Okta, or others engaged in misconduct, his investment in Okta would be substantially devalued and his lucrative position jeopardized.  Further, if Kerrest acknowledged that executives at Okta had engaged in the wrongdoing alleged, he would be acknowledging that he, as COO of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

128.    Defendant Kerrest is named as a defendant in the pending securities class action. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

129.    Kerrest benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Okta Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

130.    Kerrest authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

131.    Further, Defendant McKinnon and Defendant Kerrest have a long-standing business relationship which precludes them from acting in an independent and disinterested manner.  The two worked together for years at Salesforce, Inc. before serving on Okta's Board.

132.    Kerrest authored a book entitled, *Zero To IPO*.  According to the 2022 Proxy Statement, in April 2022, Okta purchased $339,552 worth of copies and plans to distribute the books to participants at events as well as Okta employees.  Therefore, Kerrest cannot take action against the other members of the Board who helped publicize his book with the required disinterest and independence.

133.    Kerrest, as a director of Okta, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Okta's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's integration with Auth0 and the vulnerabilities of the Company's security systems.

134.    Kerrest is neither disinterested nor independent.  Any demand upon Defendant Kerrest is futile and, thus, excused.

**C.    Demand Upon Defendant Archambeau Is Excused**

135.    Defendant Archambeau will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm her and her investments. As of April 1, 2022, Archambeau held 7,802 shares of Okta common stock.  If Archambeau admitted that she, Okta, or others engaged in misconduct, her investment in Okta would be substantially devalued.  Further, if Archambeau acknowledged that executives at Okta had engaged in the wrongdoing alleged, she would be acknowledging that she, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

136.    Archambeau authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

137.    Archambeau, as a director of Okta, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Okta's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's integration with Auth0 and the vulnerabilities of the Company's security systems.

138.    Archambeau, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Okta's compliance with relevant laws, rules, and regulations. Archambeau utterly failed to perform these essential duties.

139.    Archambeau is neither disinterested nor independent.   Any demand upon Defendant Archambeau is futile and, thus, excused.

**D.    Demand Upon Defendant Dixon Is Excused**

140.    Defendant Dixon will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  As of April 1, 2022, Dixon held 2,074 shares of Okta common stock.  If Dixon admitted that he, Okta, or others engaged in misconduct, his investment in Okta would be substantially devalued.  Further, if Dixon acknowledged that executives at Okta had engaged in the wrongdoing alleged, he would be acknowledging that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

141.    Dixon authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

142.    Dixon, as a director of Okta, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Okta's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's integration with Auth0 and the vulnerabilities of the Company's security systems.

143.    Dixon is neither disinterested nor independent.  Any demand upon Defendant Dixon is futile and, thus, excused.

**E.     Demand Upon Defendant Epstein Is Excused**

144.     Epstein received $584,472 in 2022 in compensation in the form of fees and stock and option awards for his service as a director in 2022.  Epstein earns compensation far in excess of the compensation that directors earn at equivalently sized companies.  For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a mid-cap company like Okta[30] is $236,000, thus Epstein earned 147% more than the average director.

145.     Defendant Epstein will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  As of April 1, 2022, Epstein held 478 shares of Okta common stock.  If Epstein admitted that he, Okta, or others engaged in misconduct, his investment in Okta would be substantially devalued.  Further, if Epstein acknowledged that executives at Okta had engaged in the wrongdoing alleged, he would be acknowledging that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

146.     Epstein authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

147.     Epstein benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Okta Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

148.     Epstein is an operating partner at Bessemer Venture Partners ("Bessemer"), a venture capital firm, since 2011.  Bessemer was an early investor in Auth0, leading a $2.4 million early round of seed investment in the company.[31]  Bessemer invested approximately $93.7 million

---

[30]     The FW Cook survey defines a mid-cap company as one with a market capitalization of between $2 billion and $10 billion.

[31]     Martin Gontovnikas, Auth0 Blog, https://auth0.com/blog/auth0-iaas-secures-millions-in-early-funding/ (last updated April 8, 2021).

dollars in Auth0 over the years and made over 1.3 billion in the acquisition of Auth0 by Okta.[32] Therefore, Epstein cannot consider a demand to take action against the other members of the Okta Board with the required disinterest and independence because it would damage Epstein and Bessemer's credibility, and weaken their ability to attract future business.

149.    Epstein, as a director of Okta, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Okta's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's integration with Auth0 and the vulnerabilities of the Company's security systems.

150.    Epstein, as Chair of the Audit Committee, had duties regarding oversight of the risks facing the Company and Okta's compliance with relevant laws, rules, and regulations. Epstein utterly failed to perform these essential duties.

151.    Epstein is neither disinterested nor independent. Any demand upon Defendant Epstein is futile and, thus, excused.

**F.    Demand Upon Defendant Grady Is Excused**

152.    Defendant Grady will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of April 1, 2022, Grady held 107,808 shares of Okta common stock. If Grady admitted that he, Okta, or others engaged in misconduct, his investment in Okta would be substantially devalued. Further, if Grady acknowledged that executives at Okta had engaged in the wrongdoing alleged, he would be acknowledging that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

---

[32]    Yuliya Chernova, *The Wall Street Journal*, *Auth0 Backers Projected to See Blockbuster Return From $6.5 Billion Sale to Okta*, March 5, 2021, https://www.wsj.com/articles/auth0-backers-projected-to-see-blockbuster-return-from-6-5-billion-sale-to-okta-11614942000.

153.    Grady authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

154.    Grady is a managing member of Sequoia Capital, a venture capital firm.  Sequoia is a close investment partner with Okta.  For example, Sequoia led a $75 million Series E investing round for Okta in 2014.  In an article on Sequoia's website,[33] the venture capital firm describes Defendant McKinnon and Kerrest in superlative terms:

> *The creative spirits. The underdogs. The resolute. The determined. The outsiders. The defiant. The independent thinkers. The fighters and the true believers.*
>
> These are the founders with whom we partner. [I]t takes extraordinary people to do extraordinary things.
>
> Todd McKinnon and Freddy Kerrest are two such people. And part of what makes them extraordinary is the insight with which they founded Okta….
>
> [McKinnon and Kerrest] not only understood this – they bet their careers on it, recruited a supremely talented team, and chose a few partners – Sequoia included – to join them in building that foundation.

Therefore, Grady cannot consider a demand to take action against the other members of the Okta Board with the required disinterest and independence because it would jeopardize Sequoia's investment in Okta, damage Grady and Sequoia's credibility, and weaken their ability to attract future business.

155.    Further, Defendant McKinnon and Defendant Grady have a business relationship which precludes them from acting in an independent and disinterested manner.  McKinnon served as a consultant and advised Grady and Sequoia on potential investments.  Grady praised McKinnon's candor and described how he saved Sequoia from a bad investment through his "super-candid and super-clear" nature.

156.    Grady, as a director of Okta, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Okta's core operations and making truthful, accurate,

---

[33]    Sequoia Capital Website, *Okta IPO: Two Founders We Identify With.*

and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's integration with Auth0 and the vulnerabilities of the Company's security systems.

157.    Grady, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Okta's compliance with relevant laws, rules, and regulations.  Grady utterly failed to perform these essential duties.

158.    Grady is neither disinterested nor independent.  Any demand upon Defendant Grady is futile and, thus, excused.

### G.    Demand Upon Defendant Horowitz Is Excused

159.    Defendant Horowitz will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  As of April 1, 2022, Horowitz held 557,633 shares of Okta common stock.  If Horowitz admitted that he, Okta, or others engaged in misconduct, his investment in Okta would be substantially devalued.  Further, if Horowitz acknowledged that executives at Okta had engaged in the wrongdoing alleged, he would be acknowledging that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

160.    Horowitz authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

161.    Horowitz is the co-founder and a general partner at Andreessen Horowitz, a venture capital firm.  Andreessen Horowitz was one of the early investors in Okta, leading an early $10 million venture funding round.  In conjunction with the investment, Horowitz joined the Okta Board.  Horowitz cannot consider a demand to take action against the other members of the Okta Board with the required disinterest and independence because it would damage Horowitz and Andreessen Horowitz's credibility and weaken their ability to attract future business.  Further,

Horowitz has a long-standing business relationship with McKinnon which precludes him from acting with the requisite independence and disinterest.

162.    Horowitz, as a director of Okta, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Okta's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's integration with Auth0 and the vulnerabilities of the Company's security systems.

163.    Horowitz is neither disinterested nor independent.  Any demand upon Defendant Horowitz is futile and, thus, excused.

### H.    Demand Upon Defendant Saeger Is Excused

164.    Defendant Saeger will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm her and her investments.  As of April 1, 2022, Saeger held 7,132 shares of Okta common stock.  If Saeger admitted that she, Okta, or others engaged in misconduct, her investment in Okta would be substantially devalued.  Further, if Saeger acknowledged that executives at Okta had engaged in the wrongdoing alleged, she would be acknowledging that she, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

165.    Saeger authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

166.    Saeger benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the Okta Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

167.    Saeger, as a director of Okta, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with

all laws, rules, and regulations governing Okta's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's integration with Auth0 and the vulnerabilities of the Company's security systems.

168.   Saeger failed to uphold her additional obligations as a member of the Nominating and Corporate Governance Committee, which include, inter alia, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

169.   Saeger is neither disinterested nor independent.  Any demand upon Defendant Saeger is futile and, thus, excused.

### I.    Demand Upon Defendant Stankey Is Excused

170.   Defendant Stankey will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  As of April 1, 2022, Stankey held 18,334 Okta Class A shares and 190,000 Okta Class B shares.  If Stankey admitted that he, Okta, or others engaged in misconduct, his investment in Okta would be substantially devalued.  Further, if Stankey acknowledged that executives at Okta had engaged in the wrongdoing alleged, he would be acknowledging that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

171.   Stankey authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

172.   Stankey, as a director of Okta, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Okta's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in

connection with the Company's integration with Auth0 and the vulnerabilities of the Company's security systems.

173.    Stankey failed to uphold his additional obligations as a member of the Nominating and Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

174.    Stankey is neither disinterested nor independent.  Any demand upon Defendant Stankey is futile and, thus, excused.

**J.      Other Factors Demonstrating That Demand Upon The Individual Defendants Is Excused**

175.    Okta has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

176.    The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

177.    Publicly traded companies, such as Okta, typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses.  However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover Okta's damages.

**VII.    CLAIMS FOR RELIEF**

<u>**COUNT ONE**</u>
**Against the Individual Defendants for**
**Violations of Section 14(a) of the Exchange Act**

178.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

179.    The Section 14(a) claim alleged herein is based solely on negligence.  It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud.  Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

180.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

181.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

182.    The 2022 Proxy Statement was materially false and misleading because the Individual Defendants were required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Okta's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's integration with Auth0 and the vulnerabilities of the Company's security systems.

183.     The misleading information contained in the 2022 Proxy Statement was material to Okta's shareholders in determining whether to elect Defendants Epstein, Kerrest, and Saeger to the Board.

184.     The material misstatements and omissions in the 2022 Proxy Statement damaged the Company.

185.     Plaintiff, on behalf of Okta, seeks relief for damages inflicted upon the Company based on the misleading 2022 Proxy Statement in connection with the improper election of the members of the Board.

## COUNT TWO
### Against the Individual Defendants
### for Breach of Fiduciary Duties

186.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

187.     The Individual Defendants owed and owe fiduciary duties to Okta.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Okta the highest obligation of good faith and loyalty in the administration of Okta's affairs, including assuring that Okta complied with state and federal laws governing, among other things, the making of truthful, complete, and accurate public statements regarding the Company's financial condition and business prospects.  The Board also had specific duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Okta alleged herein.

188.     The Individual Defendants ignored their duties.  The Individual Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

189.     The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned, and abdicated their responsibilities and duties regarding prudently managing the business of Okta in a manner consistent with the duties imposed upon them by law. The Individual Defendant were required to, but failed to: (1) implement and maintain an effective

41

system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Okta's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags in connection with the Company's integration with Auth0 and the vulnerabilities of the Company's security systems.

190.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Okta has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.  Such damages include, among other things, the costs of defending and resolving the pending securities class action lawsuit.

191.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT THREE**
**Against the Individual Defendants**
**for Contribution and Indemnification**

192.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

193.   The Company's alleged liability on account of the wrongful acts and practices, as well as related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Individual Defendants.

194.   The Company has suffered significant and substantial injury as a direct result of the Individual Defendants' actions.  Plaintiff, on behalf of the Company, seeks relief from the Individual Defendants on a theory of contribution and indemnity to the extent that the Company is found liable for the Individual Defendants' actions.

**COUNT FOUR**
**Against the Individual Defendants**
**for Aiding and Abetting**

195.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

196.    Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

197.    In committing the wrongful acts, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

198.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

199.    Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

**COUNT FIVE**
**Against the Individual Defendants**
**for Gross Mismanagement**

200.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

201.    The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage and control the operations, business, and internal controls of the Company.

202.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned, and abdicated their responsibilities and duties regarding prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law.

203.    During the course of the discharge of their duties, the Individual Defendants knew or disregarded the unreasonable risks and losses associated with their misconduct, yet they caused

the Company to engage in the scheme complained of herein which had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged the Company.

**VIII.   PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Okta and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants violated Section 14(a) of the Exchange Act;

(c)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Okta and its shareholders;

(d)    Declaring that the Individual Defendants have grossly mismanaged Okta;

(e)    Directing the Company to take all necessary actions to reform and improve its internal controls and Board oversight;

(f)    Determining and awarding to Okta the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(g)    Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

(h)    Awarding Okta restitution from the Individual Defendants, and each of them;

(i)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(j)    Granting such other and further relief as the Court may deem just and proper.

**IX.   JURY DEMAND**

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: December 13, 2022

**WEISS LAW**

By:   */s/ Joel E. Elkins*
Joel E. Elkins (SBN 256020)
611 Wilshire Blvd., Suite 808
Los Angeles, CA, 90017
Telephone: 310/208-2800
Facsimile: 310/209-2348

-and-

**WEISS LAW**
David C. Katz
Mark D. Smilow
Joshua M. Rubin
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (212)682-3025

*Attorneys for Plaintiff*

**VERIFICATION**

I, Barry Rosenfeld, on behalf of the LR Trust (the "Trust"), hereby verify that the Trust is a stockholder of Okta, Inc. ("Okta"), having acquired Okta shares in December 2020 and having held Okta shares continuously at all relevant times herein. I, on behalf of the Trust, am ready, willing, and able to pursue this stockholder derivative action on behalf of and for the benefit of Okta. I have reviewed the allegations in the attached Verified Stockholder Derivative Complaint (the "Complaint"), and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate, and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason, I believe them to be true. Having received a copy of the Complaint, and having reviewed it with my counsel, I hereby authorize its filing on behalf of the Trust.

Dated: December 12, 2022

Barry Rosenfeld, Trustee
LR Trust